**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

I.E.C., on her own behalf and
by through her Parent and
Guardian, J.R.,

           Plaintiffs,

-vs-

Minneapolis Public Schools, SSD No. 1,
Minnesota Department of Education, and
Brenda Cassellius, Commissioner

           Defendants.

Civil File No.  12-cv-2398 &
               12-cv-2997(MJD/LIB)

**PLAINTIFFS' MEMORANDUM IN SUPPORT**
**OR MOTION FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

This case is about the right of children with disabilities access to the Minnesota

special education administrative hearings under the Individuals with Disabilities Education Act

("IDEA"), 20 U.S.C. §§ 1400, *et seq*. and the consequences when administrative hearing

requests are denied.

Plaintiff I.E.C. ("Bella"), and her mother, J.R. ("Ms Russell"), filed two Administrative

Hearing Complaints against the Minneapolis Public Schools ("Minneapolis") but were denied the

statutory right to an administrative hearing. The right to a special education administrative

hearing is a core right under the Act. Congress clearly mandates civil remedies as a means to

ensure compliance under the Act.

The denial of an administrative hearing is based upon case law that contravenes the plain

meaning of the Act.

The MDE, according to federal law, is vested with the ultimate responsibility under the Act to provide a system of administrative hearings that protects the rights of children with disabilities. 34 C.F.R. §§ 300.121-300.156. *Letter to Librera,* OSEP (20 December 2004)(attached). Instead, the MDE declined to undertake its duties by expressly conceding to case law that violates the Act, amending its Notice of Procedural Safeguards to conform with the violative case law, and permitting unlawful dismissals of hearing requests through its contracted agents, the Office of Administrative Hearings.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is proper when "there is no genuine issue as to any material fact" such that "the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Once a party has filed a motion for summary judgment, the burden shifts to the non-moving party to "go beyond the pleadings and 'by affidavit or otherwise' designate 'specific facts showing that there is a genuine issue for trial.' " *Commercial Union Ins. Co. v. Schmidt,* 967 F.2d 270, 271 (8th Cir.1992).  A dispute is genuine "if the evidence is such that a reasonable trier of fact could return a decision in favor of the party opposing summary judgment." *Id.* at 272.

Summary judgment is therefore appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

The moving party has the burden of persuading the Court as to the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548 (1986).   The moving party may do so with affirmative evidence or by " 'showing'-that is pointing out to the

district court-that there is an absence of evidence to support the nonmoving party's case." *Id.* at

325, 106 S.Ct. 2548.

## III.   UNDISPUTED FACTS

From 22 January 2011 to 13 April 2011, while Bella was attending Lake Harriet

Community School within the Minneapolis Public Schools, Ms Russell corresponded with Amy

Moore, assistant general counsel for the Minneapolis Public Schools.  Ex. 1.[1]  On the 25th of

March 2011, Ms Russell wrote to Ms Moore requesting special education interventions for Bella:

> Thank you so much for looping back.  So, ultimately there are no services or resources
> available for [I.C.] to support her math LD through school or the District?  That is such a
> disappointment, though it's been nearly three months of waiting, so the news isn't terribly
> surprising to me at this point.

*Ex. 1, p.100.*   Ms Moore did not respond to Ms Russell's inquiry for special education services

for Bella, but rather offered a privately paid tutor for Bella and proposed a summer math

program.  *Id.*  During this same period of time, and at the insistence of Minneapolis Public

Schools, Bella was given a Section 504 Plan.

In December 2011, Ms Russell moved Bella from Washburn High School within

Minneapolis to another public school, South View Middle School, in Edina, Minnesota.  *Ex. 2.*

This move to address Bella's education needs was unsuccessful.  *Ex. 2.*

On the 26th of March 2012 Ms Russell filed a formal complaint with the Minnesota

Department of Education. *Exhibit No. 1(Minnesota Department of Education Decision,22 May

2012*).  The issue before the MDE in its internal complaint system was identified as follows:

> The Complainant alleges the District failed in its child find obligations by not evaluating
> and identifying the Student as a student with a disability. Additionally, the Complainant
> alleges the District's child find procedures do not comply with state and federal
> requirements.

---

[1]   This email correspondence was attached to Minneapolis' response to Ms Russell's formal complaint with the
MDE and marked as "Attachment I."

*Ex. 2, p. 1.*

After the formal complaint to the MDE, Ms Russell sent correspondence dated the 9th of

April 2012, to Minneapolis and its agents placing Minneapolis on notice of her intent to move

Bella:

> My daughter, [I.C.], attended school at Lake Harriet Community School and Washburn
> High School. She was diagnosed with Attention Deficit Hyperactivity Disorder
> Inattentive Type and Dyscalculia in December 2011 during her 8th grade year. I
> requested an evaluation during her 7th grade school year, and, I continued to request an
> evaluation for special education but was denied the evaluation. Instead I was told that
> [I.C.] was required to first try a 504 plan. We did try the 504 plan but it wasn't
> successful. [I.C.] continues to lack attention, organization, school work completion and
> testing skills.

*Ex. 2.*

Ms Russell also wrote:

> We withdrew [I.C.] from Washburn in December 2011 for a host of reason, and it was
> clear by that point that the 504 didn't produce results for [I.C.]. She transferred to South
> View Middle School in Edina. It's become obvious that the change in schools was not
> the solution but that she needed assistance to address her disability.

*Id.*

She informed Minneapolis and its agents that she had received, for the first time, a copy

of the Notice of Procedural Safeguards from the MDE because of her formal complaint. *Id.*

On the 22nd of May 2012, the MDE found that MPS had violated Bella's right to

identification and evaluation as a student with a disability under the IDEA and had engaged in a

system-wide (or systemic) violation of the Act by implementing a written policy that denied

children with disabilities the right to identification and evaluation consistent with the IDEA. *Ex.*

*3, Conclusions.* The MDE issued the following corrective action:

> Because the Student has not yet been found eligible and in need of special education and
> related services and is no longer in the District, compensatory education services are not
> ordered. *If the Student returns to the District, the District will proceed with child find*
> *procedures in accordance with this decision.*

4

*Id. at p. 5, ¶ 2.*

MDE's corrective action included findings of fact recording the written correspondence and oral communications between Minneapolis and Ms Russell, noting that Ms Russell had repeatedly requested assistance for Bella's disability-related education needs as early as March 2010. *Ex. 3, p. 1, ¶¶ 2, 3, 4, 8,and 9.* The MDE's findings of fact reflected that Minneapolis failed to identify or evaluate Bella. *Id.* Instead, MPS unlawfully required Ms Russell to obtain a private evaluation and start with a Section 504 plan. *Id.* Minneapolis did not identify or initiate an evaluation for Bella as required under the Individuals with Disabilities Education Act. *Id.*

Minneapolis was ordered to amend its Total Special Education System ("TSES") so Minneapolis policies and procedures would comply with the IDEA's child find requirement.

Bella returned to Minneapolis Public School on the 7th of March 2012 when she was hospitalized for disability-related mental health issues and participated an out-patient treatment program located within the Minneapolis Public Schools.[2] She remained in MPS until June 2012. From March to May, during the remainder of the 2012 school year, MPS did not identify or evaluate Bella.

Her primary treating physician, during hospitalization and out-patient treatment, recommended that Bella attend a residential mental health treatment program to meet her disabilities and mental health needs. Ms Russell responded to the physician's recommendation and placed Bella, at St Cloud Children's Home in early June 2012. Bella was discharged the first week of July 2012 and returned to MPS.

---

[2] The resident school wherein hospitals and residential settings, including juvenile facilities, reside are responsible to provide special education and related services for those children within those programs.

Upon her return to MPS, Ms Russell wrote MPS on the 11th of July 2012 requesting an evaluation and individualized education program ("IEP") for Bella so she could start the school year well.    MPS declined, asserting that Bella was "dis-enrolled" from MPS.  MPS required that Ms Russell file an "enrollment form" prior to initiating an evaluation.  After providing a signed enrollment form, MPS scheduled a meeting with Ms Russell three days prior to the first day of the school year.

At all times relevant herein Bella's mother maintained her residence in the Minneapolis Public School boundaries.

## IV.   PROCEDURAL POSTURE

Plaintiff's filed their first Complaint and Request for an Administrative Hearing ("Hearing Complaint I") on the 11th of June 2012.  No evidentiary hearing was held regarding the facts and claims set forth in the complaint.  Instead, the Administrative Law Judge held an evidentiary hearing solely for the purpose of determining whether Bella and her parent provided the proper "notice" to the District consistent with the Eighth Circuit Court of Appeals' analysis under *Thompson v. Board of Special Sch. Dist. No. 1*, 144 F.3d 574 (8th Cir. 1998) and its progeny.[3]

The Administrative Law Judge (ALJ") specifically identified the scope of the evidentiary hearing:

> I recently issued an order responding to a motion for summary disposition.  I indicated in that order that there was still a material fact in dispute, the question about whether or not the complainant received notice from the District before she departed from the School District.

---

[3]   *Thompson v. Bd. of Special School Dist. No. 1*, 144 F.3d 574 (8th Cir.1998), *Smith by Townsend v. Special School Dist. No. 1*, 184 F.3d 764 (8th Cir. 1999),; *ISD 432 v. J.H.*, 8 F.Supp.2d 116, 1172-72 (D.C. MN 1998); *M.P. v. Independent Sch. Dist. No. 721*, 326 F.3d 975 (8th Cir. 2003); *C.N. v. Willmar Public Schools*, 591 F.3d 624, 629 (8th Cir. 2010).

*Trans. p. 4* (10 August 2012).

The ALJ declined to consider whether Bella's mother was timely given her Notice of Procedural Safeguards consistent with the mandates under the Act.  *Administrative Law Judge Order for Dismissal No. 1*, (MDE File No. 12-038H; OAH File No. 16-1300-22881-9)("OAH Decision 1"). *Exhibit No. 4.*

The ALJ dismissed the Plaintiffs' first Complaint with prejudice relying upon the following language in *Thompson v. Board of Special Sch. Dist. No. 1*, 144 F.3d 574 (8th Cir. 1998):

> [i]f a student changes school districts, and does not request a due process hearing, his or her right to challenge prior educational services is not preserved. Subsequent challenges to the student's previous education become moot because the new school district is responsible for providing a due process hearing.

*Thompson*, 144 F.3d at 579. See *OAH Decision 1.*

The Plaintiffs filed their second Complaint and Request for Administrative Hearing ("Hearing Complaint II) on the 21st of August 2012, while Bella was a resident of the District. Despite the request for identification and evaluation made in writing to MPS through their legal counsel on the 11th of July 2013, a special education evaluation was not initiated by MPS.

By the first week of school, beginning on the 29 August 2012, though MPS had scheduled a meeting to discuss Bella's evaluation, she was still not identified or evaluated Bella. No IEP was in place to address her unique needs.  Thus, Bella would begin another school year without being identified as a student with a disability or without the necessary supports and services to start the school year.[4] As a result, Bella's mother placed her into Avalon Charter

---

[4] REQUIREMENT THAT PROGRAM BE IN EFFECT.— (A) IN GENERAL.—At the beginning of each school year, each local educational agency, State educational agency, or other State agency, as the case may be, shall have in effect, for each child with a disability in the agency's jurisdiction, an individualized education program, as defined in paragraph (1)(A). 20 U.S.C. § 1414(d)(2).

School in Saint Paul where Bella was *immediately* identified, evaluated and provided with an individualized education program based upon the evaluation.

The ALJ summarily dismissed Hearing Complaint II on the following basis:

In this case, the Student appears to reenroll in the District for the purpose of filing for a due process hearing. . . .

* * *

*Exhibit 5.*

No evidence was taken and the ALJ concluded that MPS was "denied an opportunity to formulate a plan to meet [the Student's] needs, it cannot be shown that it had an inadequate [IEP] plan under the IDEA.  See *Administrative Law Judge Order for Dismissal No.2* (MDE File No. 13-003H; OAH File No. 16-1300-23063-9)("OAH Decision II).[5]*Exhibit 5.*

On the 17th of September 2012, the Student appealed the first ALJ decision by filing a complaint in the United States District Court (Civil File No. 12-cv-2398). On the 28th of November 2012, the Student appealed the second ALJ decision by filing a complaint in the United States District Court (Civil File No. 12-cv-2997).

The Plaintiffs moved the District Court on the 18th of December 2012 for a Motion to Amend the Complaint, Add Parties including the MDE, and to Consolidate the two Complaints. The Court issued an order denying the Motion to Amend but did consolidate the cases for the sole purpose of discovery. (Civil File No. 12-cv-2398 and 12-cv-2997). *Order (Docket No.13)*.

On the 24th of June 2013, the Magistrate dismissed the MDE as a party to the proceedings.  *Report and Recommendation (Docket No. 46)*.  The Report and Recommendation was adopted by the Court on the 26th of August 2013.  *Order (Docket No. 49)*.

---

[5] The ALJ adopted facts that were never the subject of an evidentiary hearing. The facts adopted were only those facts proposed by MPS.

# V.   ARGUMENT

As the case law in the Minnesota federal courts stands today, children with disabilities in Minnesota are routinely denied access to their statutory right to special education administrative hearings.  Eighth Circuit case law that denies this right is inconsistent with the federal statute, rules and express purpose of the IDEA.  Under the present Eighth Circuit case law, the clear language of the statue has been turned on its head.  According to this case law, a child with a disability must remain in the offending education environment in order to seek relief.  This requirement has arisen from a judicially created equitable principle that public schools are entitled to "notice" prior to the child's departure from the offending district.  This equitable principle has no authority in statute or case law across the nation.  According to the Eighth Circuit, the only adequate notice under this equitable principle is a request for a special education administrative hearing.  The Eighth Circuit has rejected all other forms of notice from families of children with disabilities.

Not only does this equitable notice requirement directly affect Bella and other similarly situated special needs children in Minnesota, but it creates an insurmountable barrier to relief under the Act for those children who are the subject of an abusive or neglectful education environment.

The legal trap created by this case law not only results in the loss of a basic procedural safeguard under the Act but can also result in the deprivation of any relief.  According to the Eighth Circuit, children who are denied access to special education administrative hearings have "failed to exhaust administrative remedies."  Rather than conclude the denial of access to a hearing is tantamount to the futility exception, the courts in Minnesota have simply dismissed all claims seeking relief.

This legal trap is exemplified in the case before the Court.  Despite many years of efforts, both orally and in writing, to obtain assistance from MPS for her daughter's disability related education needs, Ms Russell was turned away.  She was turned away under a policy and procedure that systemically violated the IDEA.  After years of requests with no results, Ms Russell did what any responsible, loving parent would do - tried to find another option for her daughter.  Where a record of the facts and merits of this case available to the Court, that record would reflect that because Bella's education needs were not met, her mental health condition was adversely affected thus requiring hospitalization and a subsequent placement in a residential mental health treatment facility in St Cloud.  MPS would argue that this is as it should be.  No matter the parental efforts, no matter the violations by the public agency (including the failure to provide Ms Russell with her a notice of her daughter's rights under the Act), children with disabilities must be excluded from relief under the Act because of the parents' failure to give notice in the form of an administrative hearing request.[6]

## I.   CHILDREN WITH DISABILITIES IN MINNESOTA ARE ENTITLED TO THE SAME FEDERALLY MANDATED PROCEDURAL SAFEGUARDS AS  CHILDREN WITH DISABILITIES ACROSS THE NATION.

The Individuals with Disabilities Education Act sets forth the specific procedural safeguards that must be in place for a state to comply with the IDEA and receive federal funding:

(a) ESTABLISHMENT OF PROCEDURES.—Any State educational agency, State agency, or local educational agency that receives assistance under this part shall establish and maintain procedures in accordance with this section to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education by such agencies.

(b) TYPES OF PROCEDURES.—The procedures required by this section shall include the following:

---

[6]   The ALJ in this case declined to consider the MDE Complaint and Decision, the electronic correspondence and oral requests between Ms Russell and MPS, and the written notice given to MPS on the 9th of April 2011 sufficient to put MPS on notice of Ms Russell's complaints.

(1) An opportunity for the parents of a child with a disability to examine all records relating to such child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to such child, and to obtain an independent educational evaluation of the child.
(2)(A) Procedures to protect the rights of the child whenever the parents of the child are not known . . .

(3) Written prior notice to the parents of the child, in accordance with subsection (c)(1), whenever the local educational agency— (A) proposes to initiate or change; or (B) refuses to initiate or change, the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to the child.

(4) Procedures designed to ensure that the notice required by paragraph (3) is in the native language of the parents . . .

(5) An opportunity for mediation, in accordance with subsection (e).

(6) An opportunity for any party to present a complaint—

> (A) with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child; and

> (B) which sets forth an alleged violation that occurred not more than 2 years before the date the parent or public agency knew or should have known about the alleged action that forms the basis of the complaint, or, if the State has an explicit time limitation for presenting such a complaint under this part, in such time as the State law . . .

20 U.S.C. §1415(b)[7].

The procedural safeguards also codify the right to counsel, the basic pleading requirements for a due process complaint, the requisite notice required to each parties, the response deadlines, as well as hearing deadlines.

The IDEA also established the right to a due process or administrative hearing:

(f) IMPARTIAL DUE PROCESS HEARING.—
(1) IN GENERAL.—

---

[7]   The federal implementing regulations mirrors the language of the Act. See 34 C.F.R. §§ 500 - 515.

> (A) HEARING.—Whenever a complaint has been received under subsection (b)(6) or (k), the parents or the local educational agency involved in such complaint shall have an opportunity for an impartial due process hearing, which shall be conducted by the State educational agency or by the local educational agency, as determined by State law or by the State educational agency.

20 U.S.C. §1415(f).  The limitations to IDEA administrative hearings are the pleading requirements and the statute of limitations set forth in the Act.   No "notice requirement" to a public school, equitable or otherwise, is codified in statute or identified in the legislative history of the IDEA.  To the contrary, all of the legislative history and subsequent amendments to the IDEA reflect Congress' intent to fortify rather than weaken the procedural safeguard of an administrative hearing.

Congress stressed that its original aim in providing administrative hearing was to allow resort to other judicial remedies for claims based on the EHA. See 1985 House Report, supra, at 7; 1986 Senate Report, supra, at 15; see also Handicapped Children's Protection Act of 1985: Hearings on S.415 Before the Subcomm. on the Handicapped of the Senate Comm. on Labor and Human Resources, 99th Cong., 1st Sess. 2 (1985) (opening statement of Senator Weicker) (Section 1415(f) "is intended to be a simple restoration and clarification of congressional intent."). Moreover, Congress specifically identified Sec. 1983, Sec. 504 of the Rehabilitation Act of 1973, and the Constitution as other sources of rights and remedies in special education cases. See 20 U.S.C. Sec. 1415(f); H.R.Conf.Rep. No. 687, 99th Cong., 2d Sess. 7, reprinted in 1986 U.S.Code Cong. & Admin.News 1807, 1809. ("It is the conferees' intent that actions brought under 42 U.S.C. 1983 are governed by this provision."); 1985 House Report, supra, at 3 ("Section 1983 prohibits, among other things, an agency acting under color of state law from abridging a handicapped person's rights under the Constitution.").

Case law across the country has reinforced the importance of the procedural safeguards. "Congress deemed IDEA's hearing provisions and other procedural safeguards an important tool in assuring handicapped children an appropriate education and protecting them from erroneous and arbitrary decisions affecting their education. See *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1041 (5th Cir. 1989) ("The Act's procedural guarantees are not mere procedural hoops . . . . Rather, 'the formality of the Act's procedures is itself a safeguard against arbitrary and erroneous decisionmaking.'") (quoting *Jackson v. Franklin County Sch. Bd.*, 806 F.2d 623, 630 (5th Cir. 1986)); see also *Honig*, 108 S. Ct. at 508 (noting that IDEA's procedural safeguards are part of a legislative scheme to provide parents "both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think inappropriate."); *Board of Educ. of the Hendrick Hudson Sch. Dist.* v. *Rowley*, 458 U.S. 176, 102 S. Ct. 3034, 3050, 73 L. Ed. 2d 690 (1982) ("Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process, see, e.g., §§ 1415(a)-(d), as it did upon the measurement of the resulting IEP against a substantive standard.")."; see also *Hunt v. Bartman*, 873 F.Supp. 229, 244 (W.D. Missouri, 1994).

Despite the significant history and statutory authority for administrative hearings for children with disabilities, the Eighth Circuit Court of Appeals created pre-requisite to the administrative procedures.  The Court's most recent iteration of this pre-requisite is found in *C.N. v. Willmar Public Schools*,  591 F.3d 624 (8th Cir. 2010):

> When *Thompson* was decided, the Minnesota statute implementing the IDEA provided that such hearings "shall be '*initiated and conducted by and in* the school district responsible for assuring that an appropriate program is provided.' " 144 F.3d at 578 (emphasis added) (quoting former Minn.Stat. § 120.17, subd. 3b(e)). And in *Thompson,* we concluded that "[i]f a student changes school districts and does not request a due process hearing, his or her right to challenge prior educational services is not preserved."

> *Id.* at 579. Rather, "[s]ubsequent challenges to the student's previous education become moot because the new school district is responsible for providing a due process hearing." *Id. Accord M.P.,* 326 F.3d at 979-81; *Smith v. Special Sch. Dist., No. 1,* 184 F.3d 764, 767-68 (8th Cir.1999). Under the version of the statute applicable to this case, due process hearings are "*conducted by the state* " and "must be held in the district responsible for ensuring that [a FAPE] is provided." Minn.Stat. § 125A.091, subd. 12(a) (2008) (emphasis added); *see also M.M. v. Special Sch. Dist. No. 1,* 512 F.3d 455, 460 & n. 4 (8th Cir.2008), *cert. denied,* --- U.S. ----, 129 S.Ct. 452, 172 L.Ed.2d 343 (2009). Relying on *Thompson* and the applicable statute, the district court concluded C.N.'s IDEA claim failed as a matter of law because the District was no longer responsible for providing C.N. with a FAPE when she requested the hearing.

*Id.* at 631.  Thus, even though the Minnesota statutes was amended to eliminate the jurisdictional bar created under *Thompson*, the Court nevertheless adopted the same bar to the administrative hearings under an equitable notice requirement not supported in statute, regulations or case law. Notable in the *Thompson* decisions and the ALJ's decisions in this case is that the only notice sufficient is the filing of an administrative hearing request.  The Plaintiffs' formal, written complaint to the MDE regarding MPS's practices and policy was insufficient notice.  The years of correspondence between the parties and Ms Russell's orals requests for services was insufficient notice.  And Ms Russell's written notice of intent to withdrawal given to MPS in April 2011 was also insufficient.

In this case, the Plaintiffs were denied two hearing requests not based on a statue of limitations defense or improperly pled claims but rather because of a judicially created equitable notice requirement that serves as a jurisdictional bar to the administrative hearing procedures.

## II.  NO OTHER COURT IN THE COUNTRY HAS ADOPTED THIS PROCEDURAL SAFEGUARD LIMITATION.

Each court that has analyzed the *Thompson* analysis, has rejected it out of hand. In *Lewis Cass Intermediate Sch. Dist. v. M.K.*, 290 F.Supp.2d 832 (W.D. Michigan 2003) the district court entertained the *Thompson* argument and found that while the resident district from which the child was removed had no present obligation to provide special education and related services to

14

the child, "'[c]ompensatory education imposes liability upon the school district to merely pay for

services that they were required to pay for all along, but for whatever reason, the district

improperly refused to do so."'(quoting *Neshaminy Sch. Dist. v. Karla B,* 1997 WL 137197, at *5-

6 (E.D. Pa. Mar. 20 1997). *Id. at 838.* The *Neshaminy* and *Lewis Cass* courts noted a common

sense approach in denying the *Thompson* analysis:

> [I]f compensatory education were not "available for a student who has moved from the
> school district after he has already been deprived of a FAPE [free appropriate public
> education] . . . then a school district could simply stop providing required services to a
> student with the underlying motive of inducing this student to move from a district, thus
> removing any future obligation under [the] IDEA which the district may owe to the

student. *Lewis Cass*, 290 F.Supp.2d at 838.

The *Lewis Cass* court found that the *Thompson* analysis would lead to "absurd outcomes,

namely:

> For example, under the Districts' reading, the student's *new* school might be required to
> arrange, conduct and pay for a due process hearing related to allegations that the *previous*
> school district violated the IDEA and owes the student compensatory education.

*Id. at 838.* The *Lewis Cass* court noted other examples of the absurd effects the *Thompson*

analysis has on the rights of children with disabilities to administrative hearing but concluded

with the following:

> The right to a hearing under [the] IDEA is too significant to be barred [simply because
> the student filed the request after moving from the district,] when [the] IDEA itself and
> its regulations fail to contain any express requirement of this type.

*Id. at 839.*

The *Thompson* argument made in *Lewis Cass Intermediate Sch. Dist. v. M.K.*, 290

F.Supp.2d 832 (W.D. Michigan 2003), was based upon Michigan's state law which contained

statutory language similar to Minnesota Special Education statute:

> The hearing shall be arranged or conducted by the district of residence and the district of residence shall pay all direct costs incurred by the school district as a result of arranging or conducting the hearing.

Mich. Admin. Code R. 340.1724(2)(2003).  The *Lewis* court not only rejected the *Thompson* analysis as leading to absurd results, but the Michigan statute was repealed to mirror the procedural hearing rights as set forth in the IDEA.  See, Mich. Admin. Code R. 340.1724f (2006).

The district court in *L.R.L. v. Dist. of Columbia*, 896 F.Supp.2d 69 (D.D.C. 2012) also took up the *Thompson* analysis and dismissed the argument as "specious" finding that:

> [T]he overarching purpose of the IDEA to provide a current FAPE to students with disabilities, but the defendant's [argument] ignores the broad remedial reach of the law.

*L.R.L.,* 2012 WL 4789532, at *6.

Despite the unique and confounding outcomes of *Thompson* and its progeny, the MDE, rather than modify the statute as Michigan did to comply with Act's procedural safeguards, simply amended the procedural safeguards to include the limitation to relief:

> **Loss of Right to a Due Process Hearing**
>
> NOTE: If your child changes school districts and you do not request a due process hearing  before you child enrolls in a new district, you may lose the right to have a due process hearing about any special education issues that arose in the previous district.

*Exhibit No. 4, p.11.*  This amendment to the Notice of Procedural Safeguards is at odds with the MDE's condition for eligibility for Part B funds under the IDEA, each state must ensure compliance with 34 C.F.R. §§ 300.121-300.156. *Letter to Librera,* OSEP (20 December 2004)(attached).

The Act explicitly states:

(A) IN GENERAL.—The State educational agency is responsible for ensuring that—

> (i) the requirements of this part are met;

> (ii) all educational programs for children with disabilities in the State, including all such programs administered by any other State agency or local agency—

20 U.S.C. § 1412(a)(11).   The Act also states that "[e]ach State that receives funds under this title shall— (1) ensure that any State rules, regulations, and policies relating to this title conform to the purposes of this title. . ."  20 U.S.C. §1408.

The MDE's responsibility for ensuring the procedural safeguards are complied with is further illustrated in *Letter to Librera,* OSEP (20 December 2004)(attached).  In that case the State of New Jersey through its Commissioner of the Department of Education argued that for children from New Jersey who were contractually attending schools in the state of New York the responsibility for providing due process hearings for those children were the responsibility of New York rather than New Jersey. OSEP disagreed and responded as follows:

> NJDEO retains ultimate responsibility for ensuring that each educational program for children administered in [New York schools] through a contractual agreement is under the general supervision of the persons responsible for educational programs for children with disabilities in New Jersey, and meets the education standards for New Jersey, including the requirements of Part B. 20 U.S.C. § 1412(1)(11); 34 C.F.R. § 300.600(a)(2)(i)-(ii).

*Letter to Librera,* OSEP (20 December 2004).

According to OSEP, New Jersey could not delegate or contract away its responsibility under the Act. In an earlier letter to Commissioner Librera, OSEP made an even stronger statement about the state's responsibilities to children with disabilities in the state of New Jersey:

> It is very clear under the IDEA that those situations the SEA remains responsible for ensuring that those children are provided an education that meets the standards that apply to the SEA and LEAs and that those children have all the rights that apply to children served by public agencies . . . NJDEO, remains ultimately responsible for ensuring that a the requirements of the IDEA are being met for these students . . . .

Citing language from the decision *G.N. v. Greco*, 282 F.Supp. 2d 221, 238-0 (D.N.J. 2003), OSEP wrote:

> state and local educational authorities are ultimately responsible for ensuring that a student's rights under the IDEA are protected, and ***they cannot divest themselves of that responsibility*** * * * [the school district] had a non-delegable obligation to ensure [student's] rights under the IDEA were not infringed.

*Letter to Librera,* OSEP (26 May 2004)(emphasis added)(attached).

While the MDE was dismissed as a party, the importance of the due process cannot be gainsaid.  It is reiterated not only in statute and regulations, but case law and opinions from the United States Department of Education, Office of Special Education Programs.  Nevertheless, the Minnesota federal courts have swept the history of the Act, the plain meaning of the Act, other case law and the position of OSEP aside in favor of an equitable notice requirement that limits the rights of children with disabilities to relief.

## III.   PLAINTIFFS MUST BE EXCUSED FROM ADMINISTRATIVE EXHAUSTION UNDER THE ACT.

Under well-established judicial interpretations of the IDEA [the student] had an obligation to exhaust her administrative remedies with regard to the issues upon which she seeks judicial review. 20 U.S.C. § 1415(i)(2)(A) (stating that a party aggrieved by the due process hearing panel's decision has the right to bring a civil action "with respect to the complaint presented"); *see also, e.g., Honig v. Doe,* 484 U.S. 305, 326–27, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988); *Independent Sch. Dist. No. 283 v. S.D.,* 88 F.3d 556, 560 (8th Cir.1996); *Urban v. Jefferson County Sch. Dist. R–1,* 89 F.3d 720, 724 (10th Cir.1996); *Babicz v. School Bd.,* 135 F.3d 1420, 1422 (11th Cir.1998), *cert. denied,* 525 U.S. 816, 119 S.Ct. 53, 142 L.Ed.2d 41 (1998); *Garro v. Connecticut,* 23 F.3d 734, 737 (2nd Cir.1994); *Family & Children's Center, Inc. v. School City of Mishawaka,* 13 F.3d 1052, 1056 (7th Cir.1994), *cert. denied,* 513 U.S. 961, 115 S.Ct. 420, 130 L.Ed.2d 335 (1994); *Crocker v. Tennessee Secondary Sch. Athletic Ass'n,* 873

F.2d 933, 935 (6th Cir.1989) (interpreting the IDEA's precursor, the Education of the Handicapped Act).

"While it is true that IDEA plaintiffs are generally required to exhaust their administrative remedies prior to seeking redress in federal court, this requirement is not inflexible." *Weixel v. Bd. of Educ. of City of New York,* 287 F.3d 138, 149 (2d Cir.2002). "Exhaustion will be excused where it would be futile [because] '*the agency has adopted a policy or practice of general applicability that is contrary to law*, or it is improbable that adequate relief is available in the administrative forum ....' " *Id.* (quoting *Mason v. Schenectady City Sch. Dist.,* 879 F.Supp. 215, 218 (N.D.N.Y.1993))(emphasis added). Exhaustion requirements may also excused where "parents have not been notified that such remedies were available to them." *Id.* (citing *J.G. v. Bd. of Educ.,* 830 F.2d 444, 447 (2d Cir.1987)).

In the instant case, not only has the MDE adopted a policy of general applicability that is contrary to law but so too have the federal courts for children with disabilities in Minnesota.

In *Weinberger v. Salfi*, 422 U.S. 749, 765-66 (1975), the Court recognized circumstances where "further exhaustion would not merely be futile … but would also be a commitment of administrative resources unsupported by any administrative or judicial interest." In this case, the Plaintiffs efforts to exhaust administrative remedies were futile.

The Supreme Court in *Shalala v. Illinois Council on Long Term Care,* 529 U.S. 1 (2000) re-affirmed the longstanding principle that "[d]octrines of 'ripeness' and 'exhaustion' contain exceptions … which exceptions permit early review when … exhaustion would prove 'futile.' "*Id.* at 22-23 (citations omitted). Clearly, in several different contexts the Supreme Court has recognized that 1) where exhaustion is futile, 2) where it cannot provide the remedy sought, 3) where there are systemic problems within the administrative process that cannot be rectified by

the system itself, 4) where there are violations of law, or 5) where exhaustion would ultimately only be postponing an inevitable return to court for the plaintiff, then none of the purposes of exhaustion is satisfied and courts rightly and prudently should excuse the exhaustion requirement.  Where the remedy sought is not available, as is the case here, this Court should recognize an exception for futility and not require exhaustion of administrative remedies under 20 U.S.C. § 1415(l). If the purposes of exhaustion are not satisfied, waiver should be considered under the limited circumstances already recognized by the Supreme Court. This Court's discretion should balance the determination of which priorities should prevail under the facts of a particular case. Here, the Court must determine whether it is the availability of administrative procedures or the availability of appropriate remedies that is paramount and comports with congressional intent. If the purpose of exhaustion of the administrative remedies is the potential for a claimant to obtain adequate relief without judicial intervention, then the Court should read statutes that require exhaustion as applying only when the relief is available through the administrative procedures. To require exhaustion would be contrary to the Supreme Court's longstanding principle that judicial discretion requires having the capacity to determine whether waiver of administrative remedies should be allowed under some limited circumstances, especially where the relief sought is not available to a plaintiff. To be consistent with this Court's past waiver of exhaustion jurisprudence, this principle should apply regardless of whether the plaintiff is a prisoner, a Social Security claimant or a child protected under the IDEA. Denying the Plaintiffs an exception to the exhaustion requirement where the administrative procedures have been denied to the student and the remedy sought was not available would pervert the purpose of the Act. The Supreme Court has never required exhaustion under circumstances where doing so would only promote a futile effort by the aggrieved party, or would result in a

meaningless but inexorable outcome. *See e.g., Reiter v. Cooper,* 507 U.S. 258, 269 (1993) (exhaustion not required when the administrative agency has "no power to decree" the relief sought); *McCarthy v. Madigan,* 503 U.S. 140, 146 (1992) ("this Court has declined to require exhaustion in some circumstances even where administrative and judicial interests would counsel otherwise"); *Honig*, 484 U.S. at 326-327 (parties "may bypass the administrative process where exhaustion would be futile or inadequate"). *See also McNary v. Haitian Refugee Center,* 498 U.S. 479, 496- 97 (1991) (holding that an alien could bring a due process challenge to INS amnesty determination procedures because the statute did not evince intent to preclude pattern and practices challenges, and without waiving the exhaustion requirements there would be no means to obtain meaningful judicial review).

The history of waiver of exhaustion jurisprudence does not reflect a Congressional antipathy toward the reasonable waiver of exhaustion under some circumstances. When it is possible for a claimant to get the relief sought, then the courts may require exhaustion; when there is no potential for the claimant to get the relief sought, then requiring exhaustion is illogical and inconsistent with the Supreme Court's long-standing and sound approach.

The exhaustion requirement that a student seek an administrative hearing before suing for relief through other federal statutes and the Constitution transforms the IDEA – a statute meant to advance the rights of students with disabilities – into a bar to recovery when the administrative procedures are not available or are denied. This unsound doctrine would prevent even the most severely traumatized children with disabilities from readily exercising their constitutional and federal rights and would encourage school districts to starve out children with disabilities with the goal of forcing the parents to change schools to meet the needs of their children.  The Eighth Circuit Court of Appeals analysis under *Thompson* and its progeny defy the most basic of

purposes of the Act, the evenhanded administration, and go to the merits of a constitutional and federal claim under the Act, as well as the exhaustion of administrative remedies.

### A.   PLAINTIFFS HAVE PROPERLY PLED A SYSTEMIC VIOLATION UNDER THE ACT THAT IS NOT SUBJECT TO ADMINISTRATIVE EXHAUSTION.

IDEA case law has carved out an exception to this requirement in situations in which exhaustion would be futile because administrative procedures do not provide adequate remedies. *See, e.g., Honig,* 484 U.S. at 326–27, 108 S.Ct. at 605– 06 (1988) (permitting suit pursuant to section 1415 to be brought directly in federal district court without exhausting administrative remedies); *Smith v. Robinson,* 468 U.S. 992, 1014 n. 17, 104 S.Ct. 3457, 3469 n. 17, 82 L.Ed.2d 746 (1984); *J.G. v. Board of Educ.,* 830 F.2d 444, 446–47 (2d Cir.1987); *Jose P. v. Ambach,* 669 F.2d 865, 868–70 (2d Cir.1982). The existence of a futility exception to section 1415's exhaustion requirement can be traced to the legislative history of the 1975 Act. Senator Harrison Williams, the author and floor manager of the Senate bill, stated that "exhaustion of the administrative procedures established under this part should not be required for any individual complainant filing a judicial action in cases where such exhaustion would be futile either as a legal or practical matter." 121 Cong.Rec. 37416 (1975). 11 The futility exception is particularly relevant in actions that allege systemic violations of the procedural rights accorded by the IDEA.

The congressional understanding of the futility exception is spelled out in detail in the legislative history leading to the Handicapped Children's Protection Act of 1986 (1986 Act), Pub.L. 99–372, 100 Stat. 796 (codified at 20 U.S.C. 1415(e)(4)(B)–(G) & (f) (1988)). Although the 1986 Act dealt primarily with attorneys' fees, this issue was linked to the question of exhaustion of remedies. *See* 20 U.S.C. § 1415(f) (1988). Senator Paul Simon, a cosponsor of both the 1975 Act and the 1986 Act, defined more precisely the parameters of the futility exception:

It is important to note that there are certain situations in which it is not appropriate to require the exhaustion of [IDEA] administrative remedies before filing a civil law suit. These include complaints that: First, an agency has failed to provide services specified in the child's individualized educational program [IEP]; second, an agency has abridged or denied a handicapped child's procedural rights—for example, failure to implement required procedures concerning least restrictive environment or convening of meetings; three, an agency has adopted a policy or *pursued a practice of general applicability that is contrary to the law*, or where it would otherwise be futile to use the due process procedures—for example, where the hearing officer lacks the authority to grant the relief sought; and four, an emergency situation exists....

131 Cong.Rec. 21392–93 (1985); *see also* H.R.Rep. No. 296, 99th Cong., 1st Sess. 7 (1985)(emphasis added).

The Plaintiffs' two Complaint before the Court set forth the following claim:

The District did not undertake its child-find obligation consistent with 34 C.F.R. § 300.111 and has systemically violated this affirmative duty under the Act through its TSES policies and procedures.

*Plaintiffs Complaint, p. 15, ¶ 50.* The systemic violation was supported by factual averments as well as the MDE Corrective Action appended to the complaints.

Courts have previously excused exhaustion of administrative remedies in cases that included allegations of systemic violations. *Heldman v. Sobol,* 962 F.2d 148 (2d Cir.1992); *Mrs. W. v. Tirozzi,* 832 F.2d 748 (2d Cir.1987); *J.G. v. Bd. of Educ. of the Rochester City Sch. Dist.,* 830 F.2d 444 (2d Cir.1987); *Jose P. v. Ambach,* 669 F.2d 865 (2d Cir.1982). In each of these cases, this Court concluded it would be futile to complete the administrative review process because the hearing officer had no power to correct the violation. In *Heldman,* a father of a student with learning disabilities brought suit challenging the manner in which hearing officers are selected in New York because he thought the system had denied his son an impartial review of his Individualized Education Program. 962 F.2d at 151. The Court concluded that exhaustion was futile because the plaintiff was challenging a regulation implementing a state statute that neither the hearing officer nor the Commissioner of Education had the authority to alter. *Id.* at

159.  The same holds true for the case at bar.  The administrative hearing system has no authority to regulate a policy or procedure within MPS that is a system-wide violation under the Act.

## CONCLUSION

The Plaintiffs respectfully request that the Court find that the denial of the administrative procedures under the Act is a violation of the basic procedural safeguards under the Act and remand these two complaints back for an administrative hearing on the merits.  Alternatively, this Court should conclude that further efforts to exhaust administrative remedies are futile and the merits of the claims should be heard consistent with the Complaints herein referenced. Finally, this Court must find that the systemic violations under the Act are not subject to the exhaustion requirement and claims on the merits can be heard.

Respectfully submitted,


**KANE EDUCATION LAW, LLC.**


Dated: 31 October 2013          /s/ Margaret O'Sullivan Kane
Margaret O'Sullivan Kane /ID # 220243
Attorney for Plaintiffs
1032 Grand Avenue
Suite 202
Saint Paul, Minnesota 55105
651/222-8611